IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

Civil Action No. _____

CRIMINAL ACTIVITY SURVEILLANCE, LLC,

    Plaintiff,

v.

BEHAVIORAL RECOGNITION SYSTEMS, INC.,
d/b/a, BRS LABS,

    Defendant.

## COMPLAINT WITH JURY DEMAND

Plaintiff Criminal Activity Surveillance, LLC, for its Complaint with Jury Demand against Defendant Behavioral Recognition Systems, Inc., doing business as BRS Labs ("BRS Labs"), alleges as follows:

### I. THE PARTIES

1. Plaintiff Criminal Activity Surveillance, LLC ("CAS") is a Delaware limited liability company with a principal place of business at 2400 Dallas Parkway, Suite 200, Plano, Texas 75093.

2. Upon information and belief, Defendant BRS Labs is a Texas corporation with a principal place of business located at 2100 West Loop South, 9th Floor, Houston, Texas 77027. BRS may be served through its registered agent, Ray C. Davis, 7710 Oxfordshire Drive, Spring, Texas 77379.

## II. JURISDICTION AND VENUE

3.  This Court has exclusive jurisdiction of this action for patent infringement pursuant to 28 U.S.C. § 1338(a).

4.  Upon information and belief, BRS Labs has minimum contacts with Texas such that jurisdiction in this forum is fair and reasonable.  Specifically and also upon information and belief, BRS Labs has its principal place of business in Texas and regularly transacts business in Texas.  For these reasons, personal jurisdiction exists over BRS Labs.

5.  Venue is proper in this Court under 28 U.S.C. §§ 1391(b) and (c) as upon information and belief, BRS Labs does business here and/or has an authorized distributor of infringing product in the division.

## III. THE TECHNOLOGY

6.  The technology at the heart of this dispute relates to Video Surveillance and analysis, which involves the use of intelligent video monitoring equipment (typically a combination of hardware and software) to analyze video images and provide an appropriate response signal (referred hereinafter as "Video Surveillance").

7.  In the ten years following the terrorist attacks of September 11, the demand and usage of Video Surveillance systems have exploded.  At least several billion dollars have been spent to install or upgrade Video Surveillance equipment at airports, train stations, commercial ports, national monuments, historic buildings, state capitols, military facilities, museums, libraries, factories and private commercial buildings.

8.  The U.S. Department of Homeland Security (the "Department") was created in response to the demand for increased domestic security precautions.  A significant portion of the Department's budget is dedicated to obtaining and analyzing video content to asses potential threats and take appropriate action in light of those threats.

9. One area of focus of the Department is transportation. Upon information and belief, the Transportation Security Administration ("TSA") has provided grants to over 50 airports in the United States for improving Video Surveillance technology since 2002. In 2009 alone, the TSA provided approximately $70 million to fund enhanced closed-circuit television technology ("CCTV") installations at 20 U.S. airports, which typically include installation of enhanced Video Surveillance technology.

10. The considerable expansion of Video Surveillance technology over the last ten years has not been confined to TSA grants or federal government facilities. Video surveillance technology has been adapted for use and is now being used in numerous industrial, retail, educational and healthcare environments, and is widely used on streets and roads for increasing public safety and the operational efficiency of traffic control systems.

11. For example, in 2010, the Video Security Business Manager for Texas Instruments, Mr. Danny Petkevich, stated "The video surveillance market is undergoing rapid change as intelligent cameras proliferate many diverse markets."

12. A recent study published by IMS Research reported that the demand for reliable Video Surveillance is increasing at a compound annual growth rate of 38% and will achieve a market value of $4 billion by this end of 2011.

### A. The Inventor And His Technology

13. The inventor of original U.S. Patent Nos. 5,666,157 ("the '157 Patent") and 6,028,626 ("the '626 Patent") and subsequent Reissue Patent Nos. RE43,147 ("the '147 Patent") and RE42,690 ("the '690 Patent"), Mr. David G. Aviv, has over 50 years of experience as an electrical engineer and developer of advanced technology systems. In particular, Mr. Aviv has an extensive background in developing satellites, satellite systems, and laser space communications. As a result of his experience, he has served as the Chairman of the Institute of

Electrical and Electronics Engineers ("IEEE") Las Vegas Chapter, he was the Vice Chairman of the Communications and Computer Division of the IEEE in Los Angeles, and he was the Chairman of the Education division of the IEEE in New York.  Mr. Aviv has also published a book on laser space communications and won various awards in the engineering field.

14. Included with his work experience, Mr. Aviv served as President of Applied Research and Consulting, Inc., or A.R.C., Inc. ("ARC").  During his time at ARC, he designed and developed several security surveillance technologies for various applications, such as monitoring cardiovascular patients and tracking parked automobiles for car-rental organizations.  Mr. Aviv also designed and developed the Public Eye Security System, which later led to the development of technology claimed in the original '626 Patent.

15. Public safety became a personal interest of Mr. Aviv in the 1980s.  At that time, Mr. Aviv's son was a medical student in New York.  His son had told Mr. Aviv of a surgeon working at New York Presbyterian hospital that was assaulted and killed leaving the hospital late at night.  Mr. Aviv believed better, smarter security was needed to protect society.

16. In the 1990s, when Mr. Aviv's son became an attending physician at the same hospital, Mr. Aviv became very concerned for his son's safety.  Mr. Aviv's son worked until very late, often leaving the hospital at 2 or 3 a.m.  There were very few security guards at the hospital and his son walked the same route from the hospital to his car that the murdered surgeon had taken.

17. Due to the continuing lack of security at the hospital, Mr. Aviv conceived of a security system that would utilize video sensors and software that could detect suspicious acts as they occurred.  When a suspicious act was occurring, an alarm or alert could be transmitted to law enforcement or security.  Mr. Aviv thought such a security system could also be beneficial for the public safety at large and perhaps have application in the national security arena.

### B. Mr. Aviv's Licensing Efforts

18. The '157 and '626 Patents were originally assigned to ARC. Mr. Aviv, on behalf of ARC, then made many attempts to commercialize and license the '626 Patent. As part of this process, Mr. Aviv approached several companies and gave presentations on the Public Eye Security System.

19. In 1998, Siemens and ARC first came into contact when both were given an opportunity to display their respective security camera systems on a subway platform provided by the New York Metropolitan Transit Authority ("MTA"). At that time, since ARC did not have its system built, Mr. Aviv sent a letter to Siemens regarding the Public Eye Security System hoping to interest Siemens into perhaps combining the strongest elements of their respective systems. Mr. Aviv received no response from Siemens.

20. In 2006, Mr. Aviv gave a presentation to Siemens regarding the Public Eye Security System. During the meeting Siemens seemed very interested in the Public Eye Security System, and in fact asked for more information. However, Siemens ultimately stopped returning any follow-up phone calls or emails.

21. In addition to Siemens, Mr. Aviv has contacted other entities in his attempts to commercialize the original '626 Patent.

22. In 1995, Mr. Aviv briefed a senior executive at then Lockheed Sanders, Inc. and had ongoing communications with Lockheed Martin until approximately 2000, which required the execution of a nondisclosure agreement. Subsequent communications resumed again in 2003, when Mr. Aviv contacted BAE Systems, Inc. who acquired Lockheed Sanders, Inc., and offered to brief the company on the Public Eye Security System again.

23. In 2002, Mr. Aviv also presented the Public Eye Security System to an executive at L-3 Communications in New York City and had subsequent communications.

24. Also in 2002, Mr. Aviv requested and met with an executive and engineer at the Raytheon Company at its El Segundo, California office. Prior to the meeting, Raytheon Company and Mr. Aviv entered into a nondisclosure agreement. After Mr. Aviv's presentation to Raytheon Company, Mr. Aviv followed-up on its request for additional information on the Public Eye Security System. Ultimately, Mr. Aviv felt that Raytheon was requesting information to implement its own system using features of the Public Eye Security System, so he did not pursue further communications.

25. Mr. Aviv met with an executive at the Motorola headquarters in Illinois also in 2002. Motorola was partnering with another company at that time for its Video Surveillance systems.

26. In 2003, Mr. Aviv briefed a team of engineers at Northrop Grumman Corporation. The discussions were detailed enough that Mr. Aviv also entered into a nondisclosure agreement with Northrop Grumman Corporation.

27. Other companies and entities which Mr. Aviv approached and then presented the Public Eye Security System to were the Defense Advanced Research Projects Agency ("DARPA"), an agency within the Department of Defense and Aerospace Corporation in 2003, Network Appliance in 2001, the Rand Corporation in 1999 and Citicorp Technology in 1998.

28. Mr. Aviv believed strongly in this technology disclosed in the '626 Patent and the good it could provide society. Ultimately, the '626 Patent, as well as the '157 Patent were assigned to Prophet, in part due to Mr. Aviv's deteriorating health.

29. By assignment from Mr. Aviv, through ARC, Prophet is the owner of the '147 Patent and the '690 Patent.

30. Through an Exclusive License Agreement, CAS was granted all substantive rights, including the exclusive right to enforce and collect damages for past, present and future infringement of the '147 Patent and the '690 Patent during all relevant times to this action.

31. Reissue proceedings were initiated by Prophet before filing any patent infringement actions to thoroughly allow the United States Patent and Trademark Office ("USPTO") to vet and address all of the pertinent prior art of which CAS, Prophet and Mr. Aviv were aware. The '147 Patent and the '690 Patent are presumed valid and enforceable pursuant to 35 U.S.C. § 282.

## IV. THE PATENTS-IN-SUIT

32. Prior to Mr. Aviv's groundbreaking innovations, early surveillance systems were dependent on a single person to scan one or more video monitors, in "real" time, and effectively monitor an area to be protected. These early systems required a relatively high level of dependency on the alertness of the person scanning the monitors to respond to an abnormal act or situation observed within the protected area.

33. Furthermore, these systems are often left to the discretion of security personnel to determine: (1) if there is any abnormal event in progress within the protected area; (2) the level of concern placed on that particular event; and (3) what actions should be taken in response to the particular event. The reliability of these early systems were thereafter dependent on the decision making capabilities and efficiency of the worker observing the video monitors.

34. Certain providers attempted to increase a user's efficiency by adding certain "enhancements" to then existing systems, such as a "quaded display" system which allowed fewer personnel to adequately supervise the monitors and thereby cover a larger protected area by condensing images onto fewer monitors. These enhancements, however, still require the constant attention of at least one person. The use of multiple-image/single screen systems also

suffered from poor resolution and provided the user with complex viewing arrangements. Thus, there was and is a great need for trainable surveillance systems which detect and respond to abnormal activity captured by video input signals and which do not suffer from the described human shortcomings.

35. On February 22, 2000, the '626 Patent, which is a continuation-in-part of U.S. Patent No. 5,666,157, was duly and legally issued for an "Abnormality Detection and Surveillance System" in the name of David G. Aviv. A reissue proceeding of the '626 Patent was filed in the USPTO on May 14, 2009. On September 13, 2011, the USPTO issued the '690 Patent, with issued independent Claims 1, 4, 6, 29, 40, 41 and 42. A true and correct copy of the '690 Patent is attached hereto as Exhibit A and is herein incorporated by reference.

36. The '690 Patent generally relates to methods for determining criminal activity by an individual within a field of view of at least one video camera.

37. The Abstract of the '690 Patent relevantly provides:

> A surveillance system having at least one primary video camera for translating real images of a zone into electronic video signals at a first level of resolution. The system includes means for sampling movements of an individual or individuals located within the zone from the video signal output from at least one video camera. Video signals of sampled movements of the individual is electronically compared with known characteristics of movements which are indicative of individuals having a criminal intent. The level of criminal intent of the individual or individuals is then determined and an appropriate alarm signal is produced.

38. Independent Claim 1 of the '690 Patent reads:

> 1. A method for determining criminal activity by an individual within a field of view of [a] at least one video camera, said method comprising:
> sampling [the] relative movements, from one or more images captured by said at least one video camera of said field of view, of an individual with respect to a moved, movable or moving object located within said field of view using said at least one video camera to generate a video signal;
> electronically comparing said video signal of said at least one video camera with known characteristics of relative movements of the individual with respect to the object that are indicative of an individual having criminal intent;

determining the level of criminal intent of said individual, said determining step being dependent on said electronically comparing step; and

generating a signal indicating that a predetermined level of criminal intent is present as determined by said determining step. (Bracketed deletions original in reissued claim.)

39.  Independent Claim 6 of the '690 Patent reads:

6.  A method for determining criminal activity by an individual within a field of view of at least one video camera, the method comprising:

generating, using said at least one video camera, a video signal of the individual within the field of view of the at least one video camera;

sampling a relative movement, from one or more images captured by said at least one video camera of said field of view, of the individual with respect to a moved, movable or moving object captured by said at least one video camera of said field of view;

electronically comparing the sampled relative movement of the individual with known characteristics of movements that are indicative of an individual having criminal intent;

determining a level of criminal intent of the individual based on the compared sampled movement of the individual; and

generating a signal indicating that a predetermined level of criminal intent is present if the determined level of criminal intent of the individual establishes that the predetermined level of criminal intent is present.

40.  In addition, a reissue proceeding of the '157 Patent was filed in the USPTO on May 14, 2009.  On January 31, 2012, the USPTO issued the '147 Patent, with issued independent Claims 1 and 5.  A true and correct copy of the '147 Patent is attached hereto as Exhibit B and is herein incorporated by reference.

41.  The abstract of the '147 Patent relevantly provides:

A surveillance system having at least one primary video camera for translating real images of a zone into electronic video signals at a first level of resolution.  The system includes means for sampling movements of an individual or individuals located within the zone from the video signal output from at least one video camera.  Video signals of sampled movements of the individual is electronically compared with known characteristics of movements which are indicative of individuals having a criminal intent.  The level of criminal intent of the individual or individuals is then determined and an appropriate alarm signal is produced.

42.  Independent Claim 1 of the '147 Patent reads:

1.  A surveillance system, comprising:

      a) a video camera for translating real images of an area into electronic video signals;
      b) means for sampling movements of an individual in located within the area from said electronic video signals of said video camera;
      c) means for electronically comparing said sampled movements with predetermined movement characteristics;
      d) means for predicting future movements of said individual based on said electronic comparing means of said sampled movements; and
      e) means for generating a signal responsive to predetermined predicted future movements.

43.     Independent Claim 5 of the '147 Patent reads:

      5.     A surveillance system, comprising:
      a video camera capable of generating electronic video signals based on real images of an area viewed by the video camera, the electronic video signals comprising a first resolution;
      a movement sampler capable of sampling movements of at least one individual in the generated electronic video signals;
      a movement comparer capable of comparing sampled movements of the at least one individual with predetermined movement characteristics;
      a future movement predictor capable of predicting future movements of the at least one individual based on the compared sampled movements of the at least one individual with the predetermined movement characteristics; and
      an alert signal generator capable of generating an alert signal responsive to predicted future movements.

## V. DEFENDANT'S INFRINGEMENT

44.     Upon information and belief, BRS Labs is a developer and manufacturer of behavior recognition software for video surveillance operation. Upon further information and belief, founded in 2005, BRS Labs was formed in direct response to the market need created from 9/11 to build a surveillance system that would continue to gain intelligence based on its ability to learn and analyze everything observed. Thus, BRS Labs set out to create a system that could detect unusual or suspicious activity without human interaction, which ultimately became AISight.

45.     Upon information and belief, BRS Labs' product, AISight, was created as the industry's allegedly first and only commercially available behavioral recognition solution for the video surveillance industry. Upon information and belief, AISight does not seek or detect

specific behaviors and is not a rule-based video analytics software. Rather, upon information and belief, the AISight product only issues an alert if the system determines a behavior is unusual or suspicious.

46. CAS first contacted BRS Labs on June 29, 2012, via letter advising of CAS's rights to license and enforce the '690 Patent. In addition, CAS enclosed publicly available information regarding BRS Labs' AISight video analytics software product and which CAS believes show that the AISight product infringed upon patent rights of CAS. A true and correct copy of this correspondence with enclosures is attached hereto as Exhibit C and is herein incorporated by reference.

47. However, before asserting a formal claim of infringement, CAS wanted to confirm its belief of infringement through an inspection of the AISight software source code. Accordingly, CAS specifically asked BRS Labs the following:

> While we believe that our current investigation of this matter constitutes a reasonable inquiry under the circumstances to proceed with a claim of infringement against BRS Labs, we appreciate that any claim asserted would be a method claim of the '690 Patent and would likely stand or fall upon how the source code of your product actually functions. Accordingly, we believe that making the source code of your AISight product available for inspection would assist CAS in confirming whether your video analytics fall within the lawful scope of one or more claims of the '690 Patent. *See, e.g. Hoffman-La Roche, Inc. v. Invamed Inc.*, 213 F.3d 1359, 1364-65 (Fed. Cir. 2000). Furthermore, in anticipation of the sensitive nature of the information sought, please also find enclosed a Non-Disclosure Agreement for your review and possible use in providing the requested information.

(Exhibit C.)

48. CAS received a response from BRS Labs on July 5, 2012, explaining that BRS Labs had referred the matter to its outside counsel for review. A true and correct copy of this correspondence is attached hereto as Exhibit D and is herein incorporated by reference. On July 10, 2012, counsel for BRS Labs sent a follow-up letter explaining it would undertake a review of

CAS's June 29, 2012 initial correspondence. A true and correct copy of this correspondence is attached hereto as Exhibit E and is herein incorporated by reference.

49. On August 21, 2012, after receiving no response from BRS Labs, CAS contacted BRS Labs once more, requesting a response. Furthermore, based upon CAS's own investigation into the publicly available material regarding BRS Labs' AISight video analytics software product, CAS also brought the '147 Patent to BRS Labs' attention. A true and correct copy of this correspondence and enclosure is attached hereto as Exhibit F and is herein incorporated by reference.

50. On August 30, 2012, BRS Labs responded with a detailed five page letter, explaining that it did not believe there was any reasonable basis for concluding that the AISight product infringed any claim of the '690 Patent. A true and correct copy of this correspondence is attached hereto as Exhibit G and is herein incorporated by reference. As part of its rebuttal, BRS Labs explained the functionality of its AISight product in great detail, stating, among other things:

> …AISight can learn, over time, to identify "activities" or "behaviors" that are expected to be observed in a given scene…when the observations of a scene exhibit changes that deviate from the observed/learned expectation – i.e., when "unusual activity" occurs – an alert can be generated.

(Exhibit G, p. 3.) Importantly, however, BRS Labs refused to make its source code available for inspection. (*Id.*, p. 5.)

51. CAS reviewed BRS Labs' contentions, but did not agree with its conclusions. Accordingly, on October 9, 2012, CAS once more sent a letter expressing its disagreement and also explained its conclusion that the AISight product fell within the scope of at least Claim 5 of the '147 Patent. A true and correct copy of this correspondence and enclosure is attached hereto as Exhibit H and is herein incorporated by reference.

52. In response, BRS Labs sent a final letter dated November 6, 2012. There, BRS Labs once more reiterated its bases for disputing any claim of infringement of the '690 Patent. In addition, BRS Labs set forth its reasons for disputing any claim of infringement of the '147 Patent. CAS was not persuaded. At best, BRS Labs' explanations were all merely issues of claim construction and at worst, a cover for BRS Labs to continue its infringement without repercussion. Indeed, CAS requested an inspection of the AISight source code in order to verify BRS Labs' explanations, which BRS Labs continued to decline. A true and correct copy of this correspondence is attached hereto as Exhibit I and is herein incorporated by reference.

53. Accordingly, upon information and belief, BRS Labs has directly and/or jointly manufactured, made, had made, used, practiced, imported, provided, supplied, distributed, sold, and/or offered for sale products and/or services that are infringing one or more claims of the '147 and/or '690 Patents and/or BRS Labs is inducing and/or contributing to the infringement of one or more of the claims of the '147 and/or '690 Patents by others.

54. Upon information and belief, BRS Labs provides video surveillance and security analytics through its AISight video analytics software product. By way of example only and upon information and belief, BRS Labs offers for sale and sells its AISight product for integration into video surveillance systems, including cameras, to capture, analyze and transfer video and allow real time viewing of the video feed. Upon information and belief, the analytics in the AISight product is capable of implementing different rules for triggering and forwarding alerts to the system operators, including object left behind and object removed functionality, among others.

55. Also upon information and belief, by way of example only, BRS Labs' AISight product also is capable of learning about the environment and identifying activities, i.e. the "background", behaviors, or objects that are part of the field of view or a normal environment.

Upon information and belief, AISight can understand which activities commonly occur in any particular scene, including objects and behaviors, and thus identify and bring to attention objects or behaviors that it believes may be out of the ordinary through real-time alert notification.

56. On information and belief, BRS Labs is infringing, literally, and/or under the doctrine of equivalents at least Claim 6 of the '690 Patent.  On information and belief, BRS Labs is infringing, literally and/or under the doctrine of equivalents, the '690 Patent in Texas and in this District by, among other things, making, using, importing, and/or offering for sale video surveillance and security analytics systems, including, but not limited to systems that generate, using a video camera, a video signal of an individual within a field of view of a camera; sample a relative movement from one or more images captures by a video camera of the field of view of the individual with respect to a moved, movable or moving object captured by the video camera of the field of view; electronically compare the sampled relative movement of the individual with known characteristics of movement that are indicative of an individual having criminal intent; determine a level of criminal intent of the individual based upon the compared sampled movement of the individual; and generate a signal indicating that the predetermined level of criminal intent is present if the determined level of criminal intent of the individual establishes that the predetermined level of criminal intent is present.  The accused instrumentalities include at least BRS Labs' AISight product.

57. On information and belief, BRS Labs is infringing, literally, and/or under the doctrine of equivalents at least Claim 5 of the '147 Patent.  On information and belief, BRS Labs is infringing, literally and/or under the doctrine of equivalents the '147 Patent in Texas and in this District by, among other things, making, using, importing, and/or offering for sale video surveillance and security analytics systems, including, but not limited to systems that generate, using a video camera, electronic video signals based on real images of an area viewed by the

video camera, sampling movements of at least one individual in the generated electronic video signals, comparing sampled movements of the at least one individual with predetermined movement characteristics, predicting future movements of the at least one individual based on the compared sampled movements of the at least one individual with the predetermined movement characteristics; and an alert signal generating an alert signal responsive to predicted future movements. The accused instrumentalities include at least BRS Labs' AISight product.

58. By way of example only and upon information and belief, the sampling of relative movement of an individual with respect to an object performed by BRS Labs' video surveillance and security analytics systems includes movement of the object with respect to the individual and/or a lack of movement of the object with respect to the individual.

59. Upon information and belief, BRS Labs' products infringe one or more claims of the '147 and '690 Patents, literally and/or under the doctrine of equivalents. Upon information and belief, BRS Labs' products and activities induce others, including purchasers and users of at least some configurations of AISight product to infringe the '147 and '690 Patents.

60. From the allegations set forth above, prior to June 2012, CAS put BRS Labs on notice of the '690 Patent and its infringement of the '690 Patent. In addition, prior to August 2012, BRS Labs was on notice of the '147 Patent and its infringement of the '147 Patent.

## VI. FIRST CLAIM FOR RELIEF
(Infringement of U.S. Reissue Patent No. RE42,690)

61. CAS incorporates herein by reference each and every allegation in paragraphs 1 through 60 as though fully set forth herein.

62. BRS Labs manufactures, makes, has made, uses, practices, imports, provides, supplies, distributes, sells, and/or offers for sale products and/or services that infringe one or more claims of the '690 Patent in violation of 35 U.S.C. § 271(a) and/or are inducing direct infringement of the '690 Patent by others by actively instructing, assisting and/or encouraging

others to practice one or more of the inventions claimed in the '690 Patent in violation of 35 U.S.C. § 271(b) and/or is contributing to direct infringement of the '690 Patent by others by offering to sell, selling or providing one or more items which constitute a material part of an invention defined by claims of the '690 Patent, knowing the same to especially made or adapted for use in an infringement of the '690 Patent, which components are not staple articles or commodities of commerce suitable for substantial non-infringing use in violation of 35 U.S.C. § 271(c).

63. CAS has been damaged as a result of BRS Labs' infringing conduct. BRS Labs is thus liable to CAS in an amount that adequately compensates CAS for such infringement which cannot be less than a reasonable royalty, together with interest and costs as fixed by this Court under 35 U.S.C. § 284.

64. BRS Labs' infringing acts have been willful and wanton and in reckless disregard for CAS's rights, entitling CAS to a trebling of its actual damages under 35 U.S.C. § 284, and making this an exceptional case for which attorney's fees should be awarded pursuant to 35 U.S.C. § 285.

### VII. SECOND CLAIM FOR RELIEF
### (Infringement of U.S. Reissue Patent No. RE43,147)

65. CAS incorporates herein by reference each and every allegation in paragraphs 1 through 64 as though fully set forth herein.

66. BRS Labs manufactures, makes, has made, uses, practices, imports, provides, supplies, distributes, sells, and/or offers for sale products and/or services that infringe one or more claims of the '147 Patent in violation of 35 U.S.C. § 271(a) and/or are inducing direct infringement of the '147 Patent by others by actively instructing, assisting and/or encouraging others to practice one or more of the inventions claimed in the '147 Patent in violation of 35 U.S.C. § 271(b) and/or is contributing to direct infringement of the '147 Patent by others by

offering to sell, selling or providing one or more items which constitute a material part of an invention defined by claims of the '147 Patent, knowing the same to especially made or adapted for use in an infringement of the '147 Patent, which components are not staple articles or commodities of commerce suitable for substantial non-infringing use in violation of 35 U.S.C. § 271(c).

67.     CAS has been damaged as a result of BRS Labs' infringing conduct. BRS Labs is thus liable to CAS in an amount that adequately compensates CAS for such infringement which cannot be less than a reasonable royalty, together with interest and costs as fixed by this Court under 35 U.S.C. § 284.

68.     BRS Labs' infringing acts have been willful and wanton and in reckless disregard for CAS's rights, entitling CAS to a trebling of its actual damages under 35 U.S.C. § 284, and making this an exceptional case for which attorney's fees should be awarded pursuant to 35 U.S.C. § 285.

## VIII.  PRAYER FOR RELIEF

CAS requests that the Court find in its favor and against BRS Labs, and that the Court grant CAS the following relief:

A. Judgment that one or more claims of the '147 Patent and the '690 Patent have been infringed, either literally, and/or under the doctrine of equivalents, by BRS Labs and/or by others to whose infringement BRS Labs has contributed or induced;

B. A permanent injunction enjoining BRS Labs and its officers, directors, agents, servants, affiliates, employees, divisions, branches, subsidiaries, parents, and all others acting in active concert or participation with BRS Labs, from infringing the '147 Patent and the '690 Patent;

C. Judgment that BRS Labs accounts for and pay to CAS all damages to and costs incurred by CAS because of BRS Labs' infringing activities and other conduct complained of herein in an amount not less than a reasonable royalty;

D. That CAS be granted pre-judgment and post-judgment interest on the damages caused to it by reason of BRS Labs' infringing activities and other conduct complained of herein; and

E. That CAS be granted such other and further relief as the Court may deem just and proper under the circumstances, including an award of enhanced damages and/or determining this to be an exceptional case pursuant to 35 U.S.C. § 285 and awarding CAS its reasonable attorneys' fees.

## VIII.  JURY DEMAND

CAS hereby requests a trial by jury pursuant to Rule 38 of the Federal Rules of Civil Procedure.

Dated: April 9, 2013			By:	/s/Robert R. Brunelli
						Robert R. Brunelli
							rbrunelli@sheridanross.com
						Patricia Y. Ho (pending admission)
							pho@sheridanross.com
						SHERIDAN ROSS P.C.
						1560 Broadway, Suite 1200
						Denver, Colorado 80202-5141
						Telephone:	303-863-9700
						Facsimile:	303-863-0223
						E-mail:		litigation@sheridanross.com

						Craig Tadlock
						TX State Bar No. 00791766
						TADLOCK LAW FIRM
						2701 Dallas Parkway, Suite 360
						Plano, Texas 75093
						Telephone: (903) 730-6789


						ATTORNEYS FOR PLAINTIFF